PORTER, WALKER & ASSOCIATES
420 S. Dixie Highway, Suite 301
Miami, Florida 33146
(305) 669.0610

April 28th, 2000

TO: Keys Fisheries, Inc.
3390 Gulfview Avenue
Marathon, Florida
ATTENTION: GARY GRAVES
4/26/00 deposition

IN RE: KEYS FISHERIES VS. MAERSK
CASE NO.: 99-10096-CIV-KING

Dear Mr. Gary Graves:

With reference to the examination of yourself, deponent in the above-styled cause, taken on April 26th, 2000, under oath, please be advised that the transcript of the Deposition has been transcribed and is awaiting signature. Please mail the enclosed errata sheet and copy to the attention of Mr. Allan Kelley and Mr. Robert Bell to the address listed on the second page.

However, if this has not been taken care of by May 20th, 2000, or prior to the date of trial, we shall conclude that the reading and signing of said Deposition has been waived, and shall then proceed to file the original of said transcript with the Party who took the Deposition, without further notice to any parties.

Very truly yours,

Lisa Shrewsbury
Court Reporter

cc: Attorneys of Record

24/8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-10096-CIV-KING

KEYS FISHERIES, INC.,

Plaintiff,

vs.

MAERSK, INC.; DAMPSKIBSSELSKABET AF 1912, AKTIESELSKAB AND AKTIESELSCABET DAMPSKIBSSEL SKABET SVENDBORG d/b/a MAERSK LINE; SEASIDE TRUCKING, INC.; SEASIDE TRANSPORT, INC., d/b/a SEASIDE TRUCKING, INC., and CONCEPCION ANOTONIO ACOSTA, individually,

Defendants.

COPY

DEPOSITION OF GARY GRAVES

taken before Lisa A. Shrewsbury, Court Reporter and Notary Public in and for the State of Florida at Large, at 3390 Gulfview Avenue, Marathon, Florida on Wednesday, April 26th, 2000, commencing at 11:30 a.m., pursuant to Notice of Taking Deposition.

APPEARANCES:

ROBERT LAMAR BELL, P.A.
(BY MR. ROBERT LAMAR BELL)
10800 Southwest 62 Avenue
Miami, Florida 33156-1073
on behalf of the Plaintiff.

FOWLER WHITE BURNETT HURLEY
BANICK & STRICKROOT, P.A.
(BY MR. ALLAN R. KELLEY)
100 Southeast Second Street
Eighteenth Floor
Miami, Florida 33131
on behalf of the Defendant.

I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MR. GRAVES | | | | |
| By Mr. Kelley | 4 | | 44 | |
| By Mr. Bell | | 36 | | 45 |

## E X H I B I T S


| DEFENDANT'S FOR IDENTIFICATION | PAGE |
|---|---|
| 1 - Work/Delivery Order | 9 |
| 2 - Seaside Bill of Lading 58069 | 10 |
| 3 - Seaside Trucking Bill of Lading 56807 | 12 |
| 4 - Certificate of Loading | 15 |
| 5 - Export Health of Certificate | 15 |
| 6 - Certificate of Origin | 15 |
| 7 - Commercial Invoice | 17 |
| 8 - Packing List | 17 |
| 9 - Master Pro Forma Bill of Lading | 20 |
| 10 - Maersk Telefax | 21 |
| 11 - Notice of Loss | 22 |
| 12 - Notice of Loss | 22 |
| 13 - Ship Report From - August | 23 |
| 14 - August 23rd Letter | 25 |
| 15 - October 7, 1996 from Franzese and Associates to John Paul-Tester and John Bannerman | 26 |
| 16 - Letter to Lloyd's Claim Office | 29 |
| 17 - Subrogation Form | 30 |
| 18 - Copy of Handwritten Notes | 30 |
| 19 - Letter From Franzese and Associates to T.R. Jones | 32 |
| 20 - Order Confirmation | 33 |
| 21 - Note from Elizabeth to Seaside Trucking | 33 |
| 22 - Blue Bonded Terms and Conditions Paper | 35 |

THEREUPON:

GARY GRAVES

was called as a witness and, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KELLEY:

Q. Please tell us your name and business address.

A. Gary Graves. 3390 Gulfview Avenue, Marathon, Florida 33050.

Q. By whom are you employed?

A. Keys Fisheries.

Q. How long have you been employed by them?

A. Since 1967.

Q. What's your position with the company?

A. Vice president.

Q. How long have you held that position?

A. A long time. I don't know. Fifteen years. I don't know.

Q. What are your duties and responsibilities as a vice president?

A. Everything. Whatever happens at Keys Fisheries I do. The president is kind of retired,

so I handle everything.

Q. How long has the company been in business?

A. Since 1967.

Q. How long have you been with the company?

A. Since that time. I started -- I think the company -- the corporation was formed in June and I started in October.

Q. What's the nature of Keys Fisheries' business?

A. Seafood processor, wholesaler, distributor.

Q. How much of your business in the last -- in the 1990s has involved export of product?

A. 50 percent probably.

Q. How much of your export business is done via ocean carriage?

A. 90, 95 percent.

Q. How often have you used Marchen in your ocean carriage exports?

A. I don't know when we started. Eight or ten years maybe, maybe longer. I'm not sure.

Q. How many containerized shipments would you export on either a weekly, monthly or

annual basis, whichever is easiest for you?

A. Probably annual. Twenty to 40 depending on the year.

Q. In the last eight to ten years have you used any carriers, other than Maersk, for those approximately 20 to 40 containers?

A. Yes.

Q. What would you estimate the percentage of shipments that would have gone with Maersk versus other carriers?

A. 10 percent probably, at the most.

Q. So that would be 10 percent with Maersk or 10 percent with others?

A. With others.

Q. In connection with all of those shipments with Maersk, would you receive an ocean bill of lading once the container is loaded aboard the ship?

A. Yes. When the container is loaded aboard the ship we get a B.L., yes.

Q. At the time you made this particular shipment, did you have in your office copies of the Maersk Line bills of lading which were used in connection with some other shipments -- at least some of those other shipments?

A. Repeat the question.

Q. I'll change the question. When you make shipments with Maersk and you receive an ocean bill of lading, do you maintain copies of those in your records?

A. Oh, yes.

Q. How long would you keep those?

A. Six, seven years, I imagine.

Q. So at the time this shipment was made, you would have had copies of the Maersk Line bill of lading in your files here, not for that shipment, but the form that Maersk Line uses?

A. Not a bill of lading for that shipment, because I never got one. But other bills of lading from Maersk?

Q. Yes.

A. Yes.

Q. If this shipment had not been hijacked in route, would you have expected it to be placed on the ship and you would have received another Maersk bill of lading?

A. Yes.

Q. The Maersk bill of lading that you would have expected to receive would have been similar to the other Maersk bills of lading that you

have in your file here?

A. I would assume so.

Q. For this particular shipment the agreement that you had with Maersk was for them to have a trucker pick up the loaded container at your facility here, transport it by truck to the port where it would then be placed on a ship, taken to destination, again, another trucker would get it after unloading it from the ship and delivering it to your customer?

A. Yes.

Q. That's what is called a door-to-door shipment?

A. Correct.

Q. Under such door-to-door shipments, the Maersk Line bill of lading is the contract to cover Maersk's responsibility from door to door?

A. I can't answer that question. I assume it is. I don't have a bill of lading. I have the booking. And when we book, it's door to door. On normal shipments it's door to door. Sometimes it's door to port depending on the customer.

When you say contract, I mean it's a bill of lading. What is ever on the bill of lading

I'll agree with.

Q. Do you have the booking note for the shipment?

A. Yes.

Q. Could we see that?

THE WITNESS: You have copies of all of these, correct?

MR. BELL: Yes, sir. I have copies.

THE WITNESS: These are the copies. I assume that's what you're looking for there.

MR. KELLEY: We'll go ahead and mark as Exhibit 1 to this deposition the booking note.

(Thereupon, the document referred to, Booking Note, was marked as Exhibit Number 1 for Identification.)

Q. (BY MR. KELLEY) This would be faxed to you by Maersk?

A. Yes.

Q. Who was your contact at Maersk with respect to booking this shipment?

A. You'll have to ask Elizabeth, because I'm not sure because there is no name on here at all. She'll know.

Q. Did you receive any other documents from Maersk before the loss occurred with respect to

this shipment?

A. From Maersk, just the Seaside Trucking.

Q. But that you would have received from Seaside when they arrived?

A. That is correct. I don't believe I received anything from Maersk prior to the theft that I'm aware of, no.

Q. Then Seaside would have brought the empty container to your facility on August 15, 1996?

A. Yes, correct. That's correct. This is Lester signing for the empty container. That is correct.

MR. KELLEY: We'll mark this Seaside Bill of Lading 58069 as Exhibit 2.

(Thereupon, the document referred to, Seaside Bill of Lading 58069, was marked as Exhibit Number 2 for Identification.)

Q. (BY MR. KELLEY) Do you recall what time the container arrived empty?

A. We normally load containers at 6:00 in the morning, so I'm assuming it was here at 5:30. That's just normally what we do. I can't remember that far back.

Q. How long does it take to load an

average 40-foot container?

A. Under two hours.

Q. On the completion of the loading a seal was put on the container?

A. Correct. Our seal.

Q. That was Seal Number 664750?

A. Yes.

Q. What time did the Seaside trucker pick up the loaded and sealed container?

A. He never left. It's a live load, so the truck backs in and as we load it, he sits in it and we seal it and he leaves. He never leaves the container. I am assuming that he left at 8:30. It's a wild guess, because it's longer than my memory.

Q. At the time the trucker removed the loaded and sealed container from your facility, was another Seaside Trucking bill of lading signed for?

A. Correct.

MR. KELLEY: We'll mark the Seaside Trucking Bill of Lading 56807 as Exhibit 3.

MR. BELL: I object. I move to strike the last question and the last response, because it wasn't specified who signed it. There is no signature here from Keys Fisheries, only from the

truck driver apparently.

THE WITNESS: Correct. The truck driver signed it. No one from Keys signed it. That is correct.

(Thereupon, the document referred to, Seaside Trucking Bill of Lading 56807, was marked as Exhibit Number 3 for Identification.)

Q. (BY MR. KELLEY) This second bill of lading in essence shows that the trucker is receiving the loaded and sealed container from you?

A. The trucker, Maersk, yeah.

Q. The bill of lading contains some form provisions regarding the time of arrival, time of departure. None of those were filled in. Do you know why?

A. I don't believe they ever are. If you want an opinion, I think you are allowed four hours to load a container. I believe if it's five or six hours they put their time in because they charge extra. As long as you're in your window, I don't believe they fill those in.

Q. Do you have any documents here that would indicate when the container left your facility loaded?

A. No.

Q. Were you present here at the facility when this container was loaded?

A. Yes.

Q. Did you participate at all in the loading of the container?

A. Supervised.

Q. Who would have loaded the container?

A. Employees of Keys Fisheries.

Q. Would they be regular employees, or do you hire day workers to load?

A. We have regular employees. We don't have day workers. We have people that work a month, three months. There are a lot of seasonal workers, not day workers. My guess is there are probably six, seven people that loaded that container.

Q. Is there anyone here at Keys Fisheries who is specifically tasked to load the containers or be responsible to supervise people who are loading the containers?

A. I've a plant manager, but I can't tell you whether he was doing another project or loaded that container. Lester Greenwood, who is my freezer manager, is responsible for staging and loading the containers. I was out there. The other

six or seven people, I have no idea. I can't verify who was working that day, if there were 15 people, who worked on the container. Whatever needs to be done is done. We don't break it down.

The only people that would be sure of what was going on in the container would be Lester, the freezer foreman, and the USDC inspector who physically checks all the lobster.

Q. When is that done?

A. At the time of loading. As it comes out of the freezer Lester would check it and Dave Ehrlich, the USDA inspector, would inspect it because he issues certificates of loading to verify what is on the container.

Q. Do you have the certificates of loading in your file?

A. Yes. The certificate of loading. That's what he does to verify what was on the container. Then he does an export health and origin certificate also. That's right. That's with his seal and stamp, right. He checks as he sees -- he checks what the temperature was on the container when it was set out; the seal.

MR. KELLEY: We'll mark, then, the Certificate of Loading as Exhibit 4, the Export

Health Certificate as Exhibit 5 and the Fish Certificate of Origin as Exhibit 6.

(Thereupon, the document referred to, Certificate of Loading, was marked as Exhibit Number 4 for Identification.)

(Thereupon, the document referred to, Export Health Certificate, was marked as Exhibit Number 5 for Identification.)

(Thereupon, the document referred to, Certificate of Origin, was marked as Exhibit Number 6 for Identification.)

Q. (BY MR. KELLEY) All of these three reports, Exhibit 4, 5 and 6, were prepared by David Ehrlich on the day the container is loaded, based on the inspection of that date?

A. That day or maybe the next day he does -- it won't say if they were delivered that day or the next day. He'll use a scratch pad, then do this on the typewriter.

Q. His inspection is performed on the day of loading?

A. He's physically present on the day of loading, yes.

Q. Is he a full-time Department of Commerce employee?

A. Yes. He's contracted through NOAA, the southeast regional office.

Q. Are any other inspections made of the cargo? Do you have an independent surveyor or anyone else?

A. We do our own in-house QC every day, but there is no one else that inspects the cargo at the time of loading.

MR. BELL: QC, is that quality control?

THE WITNESS: We do our own in-house daily. And David Ehrlich also does -- he is under contract for me to inspect the product on the line for me daily. So he inspects it on the line continuously and then he does a certificate of loading to verify what is on the container. That's our proof that's what's on the container, that's why he's hired specially to do that. That's one of his functions.

Q. (BY MR. KELLEY) What other documents would you prepare on the date of loading of the container?

A. Packing list, commercial invoice. I think that's probably it.

Q. Let me show you a document which

we'll mark as Exhibit 7 and ask if you can confirm that that's a commercial invoice?

A. Yes.

Q. And the document we'll mark as Exhibit 8, can you confirm that that is the packing list?

A. Packing list, yes.

(Thereupon, the document referred to, Commercial Invoice, was marked as Exhibit Number 7 for Identification.)

(Thereupon, the document referred to, Packing List, was marked as Exhibit Number 8 for Identification.)

Q. (BY MR. KELLEY) Is Hu Han Trading a regular customer of yours?

A. Overseas Seafood is my customer. Hu Han is a customer of Overseas Seafood.

Q. Approximately how much business would you do on an average year with Overseas Seafood?

A. One to three million probably. They're probably my second largest customer.

Q. Was the shipment insured for cargo loss?

A. Yes.

Q. Who was it insured with?

A. Lloyd's of London. I think -- T.R. Jones is the local agent in Homestead.

Q. Did you have an open cargo policy where you would -- that would insure all shipments, then each time you made a shipment would you send them a particular certificate?

A. If my memory is correct, I think at the end of the month we did a report on all shipments that we did shipments on, whether it was airplane or truck or ship whatever. I believe it was done monthly.

Q. Do you have the monthly report for August 1996?

A. I don't think so. I can probably get it. I don't think I've got it in this file. It's probably with our records. I don't believe I've got it here.

Q. If we could get that without too much difficulty and I would ask you if you could do that.

A. I can ask.

MR. BELL: T.R. Jones would probably have it in her file in Homestead or they would have a copy of it.

THE WITNESS: I would certainly assume. It's probably just up at the trailer. I'm

just double checking because this is all of my originals. I don't think anybody ever asked for it. I can ask -- when we break, I'll ask.

Q. (BY MR. KELLEY) That would be great.

Did you prepare anything to be sent to Maersk, such as a master or pro forma bill of lading?

A. I assume that this is what you're asking about, but you would have to ask Liz, Elizabeth. I assume that that's what that is. You probably have never seen that. That's probably what we would send up from Maersk.

Q. This would be sent to Maersk for them to prepare the ocean -- their bill of lading, which would be sent to you after the container is put on the ship?

A. Yes.

MR. BELL: So this is just the information that Maersk would need to fill in the bill of lading when they do it, if they do it?

THE WITNESS: Correct. I think that this maybe is a little bit different. This has a name on it, Fernando, and I know he works for Maersk.

This is another confirmation. That's another confirmation on the booking. I'm going to go back to the other one because it looks like there might be two. I don't know what the difference is. Here's the one that I've got, but that one is a little bit different. That's got the guy's name on it, so you might want that one too.

Q. It looks like the one you just handed us was the -- actually, I see what this is. The document that you just handed us is the booking confirmation. The document which we marked as Exhibit 1 is actually the work order delivery order which is given to Seaside to bring the empty container down here for you?

A. So maybe you want a copy of this for you too?

MR. KELLEY: We'll mark as Exhibit 9, the Master Pro Forma Bill of Lading. And we are marking as Exhibit 10 this Maersk Telefax. We'll note a correction in the record that Exhibit 1 is actually the work, slash, delivery order.

(Thereupon, the document referred to, Master Pro Forma Bill of Lading, was marked as Exhibit Number 9 for Identification.)

(Thereupon, the document referred to, Maersk Telefax, was marked as Exhibit Number 10 for Identification.)

THE WITNESS: This is the booking confirmation, correct.

Q. (BY MR. KELLEY) Your assistant, Elizabeth, would have spoken with Maersk regarding the booking and prepared the master bill of lading Exhibit 9 for Maersk?

A. Correct, yes.

Q. Did you make any other shipments with Maersk during August of 1996?

A. I'm sure I did, but I have to go back. It's customary. I think I probably replaced this container in a week or so. I'm almost sure. She can find the schedule.

Q. Would it be possible for you to get for us one of the bills of lading that were issued by Maersk for one of the other shipments during that August of 1996?

A. Yes.

MR. BELL: I object to relevancy, but I have no objection to it being produced for discovery purposes.

Q. (BY MR. KELLEY) What was your next

involvement with this shipment after it departed your facility during the morning of August 15, 1996?

A. I think the next day I got a phone call or Elizabeth got a phone call, I think, from Maersk asking if the container was loaded. That's when we found out that the container didn't reach the port. I'm almost sure it was the next morning.

Q. What did you do at that time?

A. Sat down and said that is pretty serious. I believe we called the insure agent like real quick and said, "Help." Then we started checking with everybody.

I think that they found the driver the next day, I believe. Was the 15th on a Wednesday? I don't know. Seems to me that it was Thursday that we found out that it was hijacked and Friday they found the driver.

So then I think we sent some letters to Maersk and other people, whatever the agent asked us to do. We notified everybody.

(Thereupon, the document, Notice of Loss, was marked as Exhibit Number 11 for Identification.)

(Thereupon, the document, Notice of Loss, was marked as Exhibit Number 12

for Identification.)

Q. (BY MR. KELLEY) Let me show you two documents which we've marked as Exhibits 11 and 12, dated August 16, and if you could confirm that those are the sort of notices of loss that you sent to Seaside Trucking and to Maersk?

A. That is correct.

Q. That was done at the insurance agent's suggestion?

A. Yes.

Q. What other communications did you have with either Maersk, Seaside or your insurer following the notices of claim, trying to keep them in a chronological order? Or did you later learn that the product had been found up in the New York/New Jersey area?

A. Yes. Months later.

Q. Did you have any involvement with the attempted salvage sale of any of that product?

A. No. No. I never found out what happened to it, who bought it, who stole it, nothing.

MR. KELLEY: We'll go ahead and mark this as Exhibit 13.

(Thereupon, the document, Ship Report

Form, was marked as Exhibit Number 13 for Identification.)

Q. (BY MR. KELLEY) We have now marked as Exhibit 13 your ship report form for the month of August, 1996. This report was sent by you to your insurance agent on or about September 9th of that year?

A. I think it's dated the 9th. Yes, I agree. I think you'll see on there that there were three or four other shipments. I think "A" is airplane and "B" is ship. For two months we do a lot of airplane and then it's all over with. That's for live lobster.

Q. This shipment would appear to be Number 12 on the second page?

A. 12. Taiwan. 24406. Yeah, I believe that's it. 24406. That is correct, it is Item 12.

Q. Is there anything on this form which would indicate who served as the carrier for the ocean shipments?

A. Let me see. Control number -- no. No. There is no place on this form for -- it just says mode of transportation, but it doesn't say who the carrier was.

Q. Based on your earlier testimony would

you anticipate that most of these movements by ship would have been with Maersk Line?

A. Yes. Maersk was our main carrier. Still is our main carrier.

Q. What was your next written communication with Maersk after August 16, 1996?

A. I don't know -- either -- this is the same one that you just talked about on the 16th?

Q. Yes.

A. I don't know if I have anything else.

(Thereupon, the document, August 23rd Letter to Maersk, was marked as Exhibit Number 14 for Identification.)

Q. (BY MR. KELLEY) Let me show you a document which we have marked as Exhibit 14, which is a letter dated August 23rd, 1996 to Maersk. Do you recognize that as being a letter from your office to Maersk?

A. Yes.

Q. Since that letter advises Maersk that your cargo underwriter was expected to pay you and then subrogate against Maersk for this loss?

A. Yes.

Q. In connection with your discussions with your insurance agent or cargo underwriters, did

they ask for a copy of the Maersk Line bill of lading?

A. I think that asked for all documents that I had. I don't know if they were specific in anything. They said, "Send us everything you got."

Q. Let me show you a document we'll mark as Exhibit 15, which is dated October 7, 1996 from Franzese and Associates to John Paul-Tester and John Bannerman and ask if you recognize that?

A. No. I don't believe I have ever seen this. This Franzese might be the underwriter.

Q. That was going to be my next question. Who they are?

A. I think they might be an underwriter. I think T.R. Jones wasn't an underwriter -- who went to Lloyd's. I'm not positive. You would have to ask T.R. Jones. But the name just rings a bell that they could be the underwriter. But I have not seen their form or that letter.

(Thereupon, the document referred to, Letter From Franzese & Associates was was marked as Exhibit Number 15 for Identification.)

Q. (BY MR. KELLEY) This letter indicates or states, "Kindly find enclosed received

from the insured copy of Maersk Shipping Lines' bill of lading." Do you recall either T.R. Jones or someone else requesting the Maersk bill of lading from you?

A. No, I don't.

MR. BELL: Are we talking about a generic form here, or what we are we talking about?

MR. KELLEY: That's what we're trying to find out. I'll just note that our Exhibit 15 consists of five pages.

MR. BELL: For the record, I object to Exhibit 15 without further identification and further authentication and further explanation to what it relates to specifically.

MR. KELLEY: I'll only note that I got it from you. That's what I'm trying to figure out, what it is.

THE WITNESS: I've never seen it, so I don't know.

Q. (BY MR. KELLEY) I'll show you another document, again, you may not have seen. It's from September 30 from T.R. Jones apparently to this Franzese and Associates.

A. Have I seen this? No.

Q. Again, referring to Exhibit 15 and

the reference to the insured as sending the Maersk bill of lading. You would be the insured under the policy?

A. Correct.

Q. Is this something that Elizabeth may have handled and might know more about, maybe, you just don't know?

A. You're right. You can ask her. If they are talking about the original bill of lading, as they were in this one, I assume they're talking about the bill of ladings from the trucking company. I don't know.

Q. Did you ever receive a declination of the claim from Maersk Line or any other response to the claim from Maersk Line?

A. Not that I'm aware of. If I received anything, it should be in this file if it was mailed to me. I didn't see it as I was looking through here and I don't see anything else from Maersk. I don't see anything else from Maersk in the file.

Q. Let me show you a document dated January 10, 1997 from Maersk to actually the Lloyd's claim office and ask if you ever received a copy of that or a notice of that copy?

A. No. I've not seen this.

MR. KELLEY: We'll go ahead and mark the Maersk letter, the January 10, 1997 letter to Lloyd's claim office as Exhibit 16.

(Thereupon, the document referred to, Letter to Lloyd's Claim Office, was marked as Exhibit Number 16 for Identification.)

Q. (BY MR. KELLEY) Any other involvement with the claim aspect of this matter that you had -- you were involved in?

A. Just calling the insurance company every week asking for my money. I think that was about it. Not that I can think of.

Q. Did you ultimately receive payment from your insurer?

A. Yes.

Q. When was that?

A. We received a wire on 11/25/96 at 8:54. Confirmation from your bank in Miami for 244,040.50.

Q. That reflected the commercial invoice value?

A. I believe it was to the penny, wasn't it? No. There was a $20 difference. Probably the $20 wire fee.

MR. BELL: That was 2 --

THE WITNESS: 2440450. They took $20 for the wire fee.

Q. (BY MR. KELLEY) You signed a subrogation form in order to get that payment?

A. Yes. I did sign it, that is correct.

MR. KELLEY: We'll go ahead and mark as 17 the subrogation form by you on November 19th, 1996.

(Thereupon, the document referred to, Subrogation From, was marked as Exhibit Number 17 for Identification.)

Q. (BY MR. KELLEY) Let me show you a document that we will mark as Exhibit 18 that has been produced to us. It's a copy of some handwritten notes. If you could just tell us what that document is?

A. That is Lester Greenwood's pallet movement for inventory control as he's coming out of the freezer. He keeps this on the forklift. Then later on he'll make a freezer ticket off of this which shows the number of cases loaded onto that container.

Q. Are the cases loaded aboard the container on the pallet or are they taken off the

pallets?

A. By hand. No pallets go in the container. It's loaded by hand.

Q. If I might have a look at your file?

A. This file?

Q. Yes. If I may?

A. This is the original file. I think this is the copy file.

Q. Do you remember having any contact with the FBI or the Metro-Dade police about this case?

A. We talked to somebody in Miami. I believe it was -- I think maybe it was the FBI. We also talked to New Jersey State Police. I think we talked to maybe Miami-Dade, whatever it's called, Metro something, to get copies of the police reports. I believe we got them from the police department. There was a copy in there I know. I think they were faxed from them.

Q. We'll mark as Exhibit 19 a copy of this letter apparently from Franzese and Associates to T.R. Jones dated August 21, 1996 in which they appeared to have asked T.R. Jones to have you prepare and send that letter to Maersk which we marked as Exhibit 14.

A. Right. This was faxed to me from T.R. Jones, it would appear.

(Thereupon, the document referred to, Letter From Franzese and Associates to T.R. Jones, was marked as Exhibit 19 for Identification.)

Q. (BY MR. KELLEY) Do you recall having contact with a surveyor or an Emmet Rongold of L&J Adjustor?

A. Yeah. I think he came down and interviewed.

Q. Any other contact beyond that?

A. Not that I recall.

Q. What is this document?

A. "Frank, call me so I can explain the box." This is a copy of our lobster bottom box. This is a ten-kilo lobster box bottom. Elizabeth's got a note on it. "Frank, call me so I can explain the box."

Q. Do you have other markings on your boxes?

A. The top is marked "AC Brand."

Q. Let me show you another document that seems to be part of the NOAA paperwork and ask if you recognize that?

A. Yes. This is Dave Ehrlich's scratch sheet as the container is loaded, which is his count, which he later fills out in the loading certificate and health certificate.

Q. Let me show you a document and ask to have it copied and we'll mark this as Exhibit 20. This is just the order confirmation from your customer, I presume?

A. Yes.

(Thereupon, the document referred to, Order Confirmation, was marked as Exhibit Number 20 for Identification.)

Q. (BY MR. KELLEY) The next document which we'll mark as Exhibit 21 is a note, apparently, from Elizabeth to Seaside Trucking giving them information concerning the packaging of the lobster?

A. This is signed Elizabeth and it's to Teresa at Seaside Transport, yes.

(Thereupon, the document referred to, Note from Elizabeth to Seaside Trucking, was marked as Exhibit Number 21 for Identification.)

Q. (BY MR. KELLEY) In connection with the transportation of this container, the party that

you reached had an agreement and the agreement was with Maersk?

A. Yes.

Q. Seaside Trucking was hired by Maersk Line to bring the empty container and then bring the loaded container to the port where it would be placed on the ship?

A. Correct.

Q. The two documents which we've marked as Exhibits 2 and 3 which are the Seaside Trucking bills of lading are merely the -- show that Seaside Trucking was making those two moves, not that they have a contract with you for the transportation of this merchandise?

A. Correct. They're consigned to Maersk from Maersk, yes.

Q. Your agreement with Maersk was to be shown in the Maersk Line bill of lading which would have been to a printed -- two-side printed form similar to Exhibit 9, which is just the master bill of lading pro forma?

MR. BELL: I object to the form of the question as calling for speculation.

Q. (BY MR. KELLEY) You can answer.

A. I think the answer to your question

is yes. This is what we send. And then they would send us the bill of lading with the correct customer and the shipper and what's on it.

Q. It would be in a typed or printed format on a blue bond type paper and then the terms and conditions would be on the back?

A. The blue paper, yes. I don't know what is on the back. But, yes, it's a blue bonded paper. That what we're going to get you a copy of, another one.

Q. We'll go ahead and mark as Exhibit 22 the copy that is produced as soon as the staff comes back after lunch.

Have you had any other losses to product in connection -- during the transportation in the last eight to ten years?

A. With any form of transportation?

Q. Let's go with ocean transportation.

A. We had a claim, I believe, with American President Lines, I believe. It was on a railroad train. It was being railroaded -- it was being transported to the ship in California. I believe it was in Georgia. The doors -- something happened and the doors sprung open. I believe it was American President Lines.

That was probably eight or nine years ago, I'm guessing. I think that's the only claim that I have with shipping.

Q. That's a great record. I have nothing else.

CROSS-EXAMINATION

BY MR. BELL:

Q. I would just like to ask you a few questions. Is there a season for this type of lobster product?

A. Yes. It starts August 6 and ends March 31 of every year.

Q. This was a shipment of Florida lobster?

A. Yes.

Q. Florida crawfish?

A. Florida lobster.

Q. Was it the beginning of the season?

A. It just started. It was my first shipment.

Q. How did the prices run in relation to the season?

A. It varies. Some years they go up as the season goes on. It's all supply and demand. It's based on the world market. If Australia is hot

and heavy, it could hurt us. It's an ongoing thing. Every container could be a different price.

Q. Generally, are the prices higher at the beginning of the season when people have not had access to the product for some time?

A. Some years, yes. Some years it goes the other way. It's strictly -- it's not a -- it's different every year.

Q. The season starts August 6 and this loss was August 15 of 1996. Do you recall anything about the price structure in 1996? Did it start out good at the beginning of the season?

A. It started out excellent.

Q. Did it decline as the season went on?

A. Without looking, I can't answer that. I can remember this year. Honest, I don't know.

THE WITNESS: This is the prices for that container?

MR. KELLEY: I was going to show you this to help refresh your recollection.

THE WITNESS: He's saying that the prices are going down. Without looking, I don't -- this is a fax from a customer that the tendency is to go downward, but I would have to look at every container.

MR. KELLEY: The witness is referring to Exhibit 20 in making that comment.

Q. (BY MR. BELL) What I'm getting at is if this shipment was missing for several months, the price would not be necessarily the same several months later as it was on August 15?

A. That is correct. The price of lobster is constantly changing weekly.

Q. And the salvage sales in New Jersey would be based on the market up there at the time that they did that; is that correct?

A. Yes. To sell whole cooked lobster, there is no market. I don't even know where they went to. There is no whole cooked lobster used out of Florida. It's not in New Jersey or New England market at all.

Q. Is there any reason for that or explanation, or that's the way it is?

A. They are Maine lobster. Homarus americanus and panulirus argus. Florida lobster are sold throughout the United States as tails. The whole cooked market is specifically Florida, California or export. Outside of a little in New Orleans or out of Atlanta, it's a Florida/California market or export.

Q. But some of these foreign countries have similar tastes as we do for the local product. Is that how it works?

A. Spiny lobster are produced all over the world. Not the same species as Florida, but spiny lobster. I mean there is a chart behind you from all over the world. So most countries are a local market. Japan has a local market. Australia has the local spiny lobsters. Taiwan has a local. The other countries fill in.

Q. So they supplement their local input with what they import?

A. Correct.

Q. So the people in the rest of the country they're used to eating Maine lobster, from the way the lobster is structured?

A. Or lobster tails. Lobster tails are the largest seller in the country. Everybody has lobster tails or -- a whole cooked lobster from Florida is not found. It's big in California because of the ethnic diversity. It's found in Florida because we catch it.

Q. On this particular shipment that was lost in route to the Port of Miami -- we presume that, that's what we've been told from the

reports -- did you ever receive a bill of lading from Maersk?

A. No.

Q. Did you ever receive any explanation from Maersk why they had not provided you with a bill of lading?

A. Not to my knowledge, no.

Q. What was the normal practice at that time? In other words, what were you expecting to happen based on your understanding of Maersk as far as the bill of lading and when it would be issued or when it would be delivered?

A. Under normal circumstances?

Q. Right.

A. We load a container. Depending on the ship, if it left the next day or the next week -- we would get a bill of lading normally the day after it was loaded on the ship, which could be two days to ten days after we loaded it here, depending on when they loaded the ship in Miami. They would take and keep it in there. When it was loaded we would get a B.L.

Q. You never had any other situation where the shipment never arrived at the port and Maersk never issued a bill of lading?

A. Correct. That never happened before.
Q. So this is the one and only situation of this type?
A. Yes. Hopefully the last.
Q. In the booking confirmation and the documents relating to the booking confirmation, was any statement in there that Maersk would be able to limit their liability in any way?
A. No.
Q. Did anyone at Maersk ever tell you that you could claim a limitations of liability between your premises and the Port of Miami?
A. No.
Q. Did anyone ever discuss what the situation would be if the shipment never arrived at the port and Maersk never issued a bill of lading?
A. No. Every time a salesman came down here -- it was just customary with all carriers that would load in Marathon or wherever we had the container, they would load it and take it to wherever, Port Charlestown, Miami, and load it. I think only American President Lines would issue a bill of lading before it hit the ship.
Q. So the sales representatives, except for American President Lines, indicated they would

make sure it got to the port. Once it got to the port they would issue a bill of lading?

A. Correct. They were proud of having clean trucks, clean containers and good service, being on time.

Q. Do you recall anything about the particular truck that transported this shipment? In other words, do you remember seeing it that day or noticing anything specific about it?

A. I was here when it was loaded. I can't --

Q. Did it say Seaside Trucking on the side of the truck or anything of that nature?

A. Well, the bill of lading we got from the trucker was Seaside. What was on the side of the truck, I don't remember.

Q. How did the truck driver identify himself?

A. With the paperwork. It had a Maersk container with the paper. He had the bill of ladings signed out -- Seaside bill of lading signed out from Maersk and another one that signed in at the port.

Q. Do you know if he showed any identification, other than the fact that he was in

possession of Maersk's container and that sort of thing?

A. Never asked and never saw, no. Never have.

Q. Did you have any direct contact with anyone prior to this loss with Seaside Trucking or anyone on behalf of Seaside Trucking?

A. Prior? I think just calling to find out where the container is or if the driver might have been late or something, but basically everything was through Maersk. If the container wasn't here when we came in at 5:00 or 6:00 to load, we would called Seaside Trucking to find out if they knew where it was so they could beep their driver.

Q. But you never hired Seaside Trucking to make any moves of your own?

A. Not that I'm aware of. It's possible we've hired Seaside to bring in stuff from Honduras, but I don't -- I have to go look.

Q. That would be on inbound, though, not the outbound?

A. Yes. To my knowledge, we've never hired them to do any outgoing business, only incoming. And I am not sure that it was Seaside.

Q. The truck driver's name was Acosta.

You had never met him before or didn't know who he was specifically?

A. No.

Q. So you wouldn't know if his name was Acosta or not?

A. That's correct.

Q. He was driving a truck and had possession of Maersk --

A. If he sat in that chair, I couldn't identify him.

Q. I have no further questions.

REDIRECT EXAMINATION

BY MR. KELLEY:

Q. What's the shelf life of this lobster if it's maintained -- if it's kept frozen?

A. Two years. Stamped on the box.

Q. How far into that shelf life were these lobsters at the time the shipment began August 15, 1996, if you know?

A. Days. The most they could have been is nine days. It couldn't have been any older than that.

Q. You're not making Florida Keys or Keys Fisheries, Inc., is not making any claim in this case, this case is just being presented by your

cargo underwriter through that subrogation form that you signed?

A. Correct. We're out of it I think.

MR. KELLEY: That's all I have.

RECROSS-EXAMINATION

BY MR. BELL:

Q. Can this product be refrozen once it's thawed out?

A. Yes. Depending on the temperature it got to, the time period. It's cooked product. So if it was raw product it would be worse. But being cooked it was already -- all the bacteria was killed and it was already preserved. So, yes. It's depending on time and temperature.

Q. You can't go and refreeze it if it is thawed out? You have to be very sure of what you're doing and very careful of what you're doing?

MR. KELLEY: Object to form.

THE WITNESS: Correct. It's time and temperature. If it's an hour or a week -- a week it's bad. What temperature did it thaw out at? 33 or 50? There are a lot of circumstances.

Q. (BY MR. BELL) 50 degrees Fahrenheit for two weeks, is that good or bad?

A. That would be mush. If you looked in

the box I think I would find soup if this was 50 degrees for two weeks.

Q. So that would have very little value in that condition?

A. I think it would be rancid. I think it would have to be thrown away.

Q. Possibly used for animal food or something of that nature?

A. I wouldn't give it to my animals. Two weeks at 50 degrees is pretty serious for seafood product. I can't imagine the bacteria, but it would have to be bad.

MR. BELL: I have no further questions.

MR. KELLEY: That's all. When this is typed up you have the right to read it to make any changes if you want. Generally the court reporter is very accurate and most witnesses waive, but it's your right.

THE WITNESS: I would like to read it.

MR. KELLEY: I'll order it.

MR. BELL: Copy.

(Whereupon, reading, signing and Notice of Filing were not waived, and the

CERTIFICATE

STATE OF FLORIDA )
SS
COUNTY OF MONROE )

I, LISA SHREWSBURY, Court Reporter, certify that I was authorized to and did stenographically report the foregoing deposition of Gary Graves pages 1 through 47 and that the transcript is a true record of the testimony given by the witness.

I further certify that said witness was duly sworn according to law.

I further certify that I am not of counsel to any of the parties to said cause or otherwise interested in the event thereof.

IN WITNESS WHEREOF I hereunto set my hand and affix my official seal of office this 27th day of April, 2000.

Lisa Shrewsbury

Notary Public State of Florida
LISA SHREWSBURY
Commission # CC742797
Expires 8 / 3 / 2002